Let's pick up the next case, set at nine, Sharp v. Blackmon. Good morning, counsel, please proceed. Good morning, your honors, and may it please the court. My name is Eric Kaira. I am counsel for Plaintiff Appellant, Kari E. Sharp, in connection to his termination by the East St. Louis Board of Fire and Police Commissioners. Fundamentally, Appellant's argument is that Chief Blackmon issued an order for a reasonable suspicion drug test to be conducted within the hour. It's Appellant's position that the collective bargaining agreement provides a standard for which a reasonable suspicion drug testing should be ordered. And under this circumstance, Chief Blackmon faces his charge upon a phone call from an individual that identified himself as Officer McNutt from the DEA, who then stated that he had information from a state officer that had come into contact with Appellant. Part of Appellant's objection was that there should have been something more done other than that phone call to support the reasonable suspicion one-hour testing. Because under the collective bargaining agreement, the reasonable suspicion one-hour testing is supported specifically based upon impairment or upon actual observation of use. So use and impairment. That there was no record in which Chief Blackmon took steps to verify that there had been an arrest and indictment or that there had actually been formal charges prior to his making the one-hour reasonable suspicion drug test order. But are you saying that it would not have mattered that he was found, I guess, with a substantial amount of illegal substance? That it would have had to have been shown that he was, I guess, using something that would have impaired him? That goes exactly to our concern in this proceeding. There was no investigation to determine what amount. Well, except that I'm just talking about in general. Are you saying that that wasn't shown to be a reasonable suspicion? That there was, I guess, I thought he was arrested. Well, Chief Blackmon relies upon the hearsay testimony of a person, an out-of-state individual identifying himself as an officer that makes claims as to whether they've been an arrest or... Okay. But if those claims were substantiated, then you wouldn't be here? Or is it the fact that you say that he had to be actually impaired by the use of an illegal or prohibited substance? Right. The distinction... Well, yes. Okay. All right. So the collective bargaining agreement provides expressly for the instance in which an individual is arrested. For what? For possession, you know, arrested or charged with drug use and possession. Possession is enough, then? Yeah. And drug-related activity under a different section of the collective bargaining agreement. Here, all the findings in the testimony, all was designed to address the issue of reasonable suspicion. In fact, in the proceedings, the question was, why were they proceeding under the reasonable suspicion testing? Because that entire provision is designed to protect the exigency of the danger of an impaired fireman from going to, you know, serving on duty, under the influence of drugs that represent an imminent threat. That's where that provision provides for that kind of active, immediate step to be taken. I'm sorry. No, go ahead. So if he had been found with a truckload of whatever substance that's illegal and that was proven, you're still saying that he should not have been subject to the exigent one-hour testing? He would have been subject to drug testing under 22.6 of the collective bargaining agreement that provides for any event of an arrest and conjunctively indictment, you know, establishing that, or that the charges for drug-related activity are established. That would be the standard that the board would have to, you know, that would be their findings. Here, the board expressedly states we have insufficient evidence to make a finding that there was any cannabis or use of the drug. The error here is that the independent investigation required under reasonable suspicion testing, safety director and their chief, would be required to at least obtain a certifying record. You know, there should be a finding beyond the, you know, the peril of this just being a random test. We are just like in a normal criminal circumstance. We are tainted by the subsequent information in our record. And so I'm trying to direct in my oral argument today the occurrences that lead up to the order itself and whether it's a proper order for which the disobedient should be discharged. Okay. I'm looking at page 8 of your brief which quotes from the collective bargaining agreement. And it says, quote, an employee shall be ordered to report for drug or alcohol testing only when there is a reasonable suspicion to believe that an employee uses illegal drugs, reasonable suspicion that he uses illegal drugs or is physically or mentally impaired under the influence, et cetera. Okay. Then it defines reasonable suspicion. And that's observable phenomena or, part II, information provided by an identifiable third party which is independently investigated by the director of safety or his designees to determine the reliability or validity of the allegation. So here the chief gets a call from a DEA agent who says, this officer was found in possession of cannabis and $50,000 cash. And you're saying that's not reasonable suspicion that he uses illegal drugs? It's our position that he is. You understand where I'm coming from on this? Absolutely, Your Honor. Absolutely. It's a fair question, and I want to parse that a bit. The issue of ---- Well, I mean, I think that's what we're doing here. You're really parsing this. That's my job. You're an attorney, so you're doing your job. Okay. The point that we're arguing, Your Honor, with respect to the venture court, your question, that the identifiable third party is not established in the findings of the record that he is, in fact, an IDE agent. The phone call from the DEA agent is hearsay to Chief Blackman. So now we're talking about a failure of proof is what we're talking about there. Right. That's correct. On the identifiable portion of this, and then secondarily, that that sufficiency of proof defect is amplified by the absence of the second clause in Roman at 2 of section 22.5B, which states that the director of safety or his designees to determine the reliability or validity that there is an investigative step that should have been made part of the record, that there was a verification. Let me ask you, in other words, you're saying that the chief before acting should have taken steps to verify that this person really was a DEA agent. That's correct. And it should have been a finding. And is there anything in the record to suggest that the person was not a DEA agent or this stop did not occur? Did your guy get on the stand and say, this never even happened? Well, there is not a frontal disavowal of that because most of the testimony in the pursuit of the discharge was directed towards the, albeit erratic, conduct of appellant post being ordered to go to the drug test, which, of course, bad social behavior tends to support what I'm stating is a defect at the inception of the order itself. I understood from the appellee's brief that there was some e-mails that went back and forth between the chief and the law enforcement officer, officers in Texas, and maybe there was another conversation or communication between a second officer other than the one that the DEA agent made the call. Was that all subsequent to the drug test, or was that part of the reasonable suspicion that the chief was acting on? We're not in a position at this stage to review what could have been produced as documentary support for the timing of that communication. I mean, we have the testimony of Chief Blackman, over-objection, of course, on other grounds for hearsay. I'm sorry. You're saying he testified that e-mails went back and forth, but he didn't produce the e-mails. In an abundance of due care, I do not wish to state definitively. I don't recall it specifically, Your Honor. Okay. That's fine. I just don't want to mislead the court inadvertently. Okay. Or a self-serving purpose. Sorry. No, but the question and the only reason why we request an oral argument was the focus of the inception of the order itself, was that under reasonable suspicion, we believe that all the elements of the reasonable suspicion standard under the collective bargaining agreement, the process, the investigation, those things had to have been established in the findings. And we believe that they are not there, which underscores what we believe to be a defect in the process. This isn't just simply constitutional. This is by contract between East St. Louis and the union, for which an appellant was or is a member to some degree. I'm not sure I understand your due process argument. It's kind of vague. Can you tell us what exactly was the denial of due process? I mean, we know there was notice. We know there was a hearing. Those kinds of things. We believe that their pursuit as a result of the collective bargaining agreement, there was an additional step pursuant to the agreements procedures under the collective bargaining agreement that created a due process issue. Obviously, I'm really circularly arguing the same point, which is we believe that there are not sufficient findings under the reasonable suspicion testing from the collective bargaining agreement that those weren't satisfied and that the conclusions are unsupported by the record. Thank you. I'll review the balance of my time, Your Honor. Please proceed. All right. Argument for the appellee. Thank you. Please report to counsel. Early March 2013, Chief Blackman. Would you identify yourself? I'm sorry. I'm Phil Rice with Rice Law Society here specifically for Chief Blackman. Early March 2013, the Chief of the Fire Department for the City of East St. Louis, Jason Blackman, receives information, not from one source, but from two sources, not just random people, but from law enforcement personnel, one of which is a DEA agent, the other which was identified as a Texas State Trooper. This is not a situation where the Chief received one phone call and half an hour later he called Sharp and his office and told them he was going to do a drug test. This is a situation where the Chief gets phone calls from two separate law enforcement agents. The Chief testified that an email was sent to him requesting some additional information, and then he engaged in phone conversations. He is the director identified in the collective bargaining agreement as a person to investigate these allegations, and he investigated. He had further discussions. He testified to this with these agents, and it was determined that he was in custody down in Texas where he had been found in possession of marijuana and a large amount of cash. I think what's happening here is that the counsel for Officer Sharp is trying to combine the requirements of the two separate sections on reasonable suspicion. As the matter rightfully pointed out, there are two separate ways by which the Chief can determine that he has reasonable suspicion to ask an officer to submit to a drug test. Those two provisions are in the disjunctive. They are not both required to be found. And the first disjunctive, I, is the one that says the Chief can have reasonable grounds, reasonable suspicion by observable information. If he sees the officer using, if he sees the officer stumbling around and appearing to be under the influence. All right, that's one way you can have reasonable suspicion. Then you have the disjunctive, I, that says he can also have reasonable suspicion if he receives information from an identifiable third party and then investigates. There is no requirement. And let me just ask, what does the record show about what the director did to investigate? That he had these conversations with the two law enforcement officers, received the written communication, I believe, from the DEA agent that had requested some additional information, and then made a determination based upon those conversations that in fact one of his officers had been stopped in the state of Texas, went in possession of cannabis and a large amount of cash and had all his fire equipment sitting in the car there. I cannot fathom that if you are the Chief of the East St. Louis Fire Department and you receive this information from law enforcement that that doesn't give you reasonable grounds to say, you know what, I've got to check and see if my officer has a drug problem and I'm going to ask him to submit the test. And the request for a test was done when the officer showed up and was on duty. March 14th, approximately 9.35, 9.45 in the morning. I know, but my point is, was he on duty? He was on duty. So there could have been a fire. He might have had to go out to a fire. So the Chief was saying, I want to make sure you're not under the influence. Absolutely, absolutely. And not only that, but when the order was given, pursuant to the collective bargaining agreement, the Chief just didn't call Officer Sharp in to tell him to go submit to a drug test. Pursuant to the collective bargaining agreement, he had a union representative there, which was Captain Walls, I believe, and he had the Assistant Chief Burns there present. And he told them all, I've got the piece of paper here, there's a specific form that they use and a specific protocol. And that form and the protocol, he ordered Lieutenant Sharp, you're going to go with Walls, you're going to go with Burns to the testing site at Memorial Hospital, and you have to have this test done within an hour. Now, we know that didn't happen. There's different versions on what happened. Both Burns and Walls testified that they walked out the door and Sharp said he had no move his car because he was parked in front of a fire hydrant and that he would meet him out front. And Burns and Walls said that when they went around front, he wasn't there. They circled around several times, couldn't find him. They tried calling him at first. They couldn't even get him on his phone. Then sometime after that, they finally were able to reach him on his phone. He first said that he had an emergency. Then he said he was going to go see his pastor. Then he said he was going to go to Gateway in Madison County to have, well, he said he was going to go to Gateway, which is a treatment center. Bottom line, there is a protocol that has to be followed on these drug tests to make sure that they're valid, and Sharp didn't do it, and he violated direct order of the chief. We all know the standard of review on findings of fact, and there's plenty of evidence in the record to support the fact that the chief did have reasonable suspicion and that the plaintiff violated the court order. Again, it's interesting that he had union representation at the meeting. So the question then comes to the second prong of the scope of review on a discharge by an administrative agency is whether or not the findings of fact are sufficient to merit a discharge, and I would submit to the court that it certainly is, not only. There's case law out there that says disobedience of a direct order in itself is sufficient cause of discharge, but the collective bargaining agreement itself specifically provides if you disobey an order to submit the drug testing within the one-hour period, you're subject to discharge. So they're put on notice, and this isn't a rookie officer. He's been on the force for 10 years. He knows the rules. I also cited cases. There's one case that I specifically cited where an officer failed to disobey an order of the chief to submit to a urinalysis sample, and they said that it's insubordination, and that in itself is sufficient to justify termination. It's not unusual. It's pretty well known that municipalities and all employers these days are facing tough problems with usage of drugs, and they've got to be on top of this stuff. We're not talking about some odious thing imposed upon this lieutenant. We're talking about a guy who got caught down in Texas, and interestingly enough, I think the court has to be denied it, I repeated it. Lieutenant Sharr took the witness stand voluntarily on his case in chief, and every time I tried to ask him what happened in Texas, his client, his attorney, directed him to not answer that question, and the board wouldn't make him answer it. I think he waived his Fifth Amendment rights by taking the stand to testify, but he refused to answer any questions regarding the stop, whether or not he had any cannabis on, whether or not he had a lot of cash, whether or not he was arrested, whether or not he was in jail. All those questions he refused to answer, and I think that goes to credibility also. Thank you, counsel. Thank you. If it may please the court, Eric Heider again for plaintiff appellant in reply. Counsel opens up and states and admits that there are protocols that are conditions to a proper order for drug testing. We're here in the unenviable position of that board, relying upon the testimony, hearsay within hearsay, that's efficiency, not being able to challenge the validity of the out-of-court statements, because it's the truth. They're offering these statements and saying, we know for certain this was a DEA agent. We don't know that Chief Blyken knew it was a DEA agent, based on the record and the findings of the board. If the board found there was sufficient evidence that it was in fact a DEA agent, that would be a separate finding. But beyond that, I've already made in my record my objections on that. Getting to the next part of this, the absence of, you know, you can't use the hearing itself as an investigation after the fact. Counsel's questions directed to plaintiff appellant on the stand regarding what occurred in Texas, he is entitled to his rights if there are any potential criminalities, and he should not, you know, whatever inferences could be drawn from that, the board must establish those findings clearly. But first and foremost, the issue of disobedience and the case that he's referencing regarding your analysis, I believe it's the Timker case, I don't have his brief in front of me, but in that case, there was an allegation, followed by the search of the officer's locker, and then there was the identification, and then they actually found drugs in his possession, and then the order for the drug testing. In this case, we don't have that sequence of events. We don't have the observation of the illegal use. We have the appellate court statement that there was marijuana, the amount of which is unknown, and whether or not there were other people. We don't have any facts as to what was actually said to Chief Blackman, and we can't, we weren't in a position to challenge whatever those statements were in terms of their veracity. So, that made it more incumbent upon Chief Blackman to obtain documentary support and offer it to the record for the board to take in to support an inclusion. Are there any additional questions from the panel? I don't think so, counsel. Thank you. All right, the court will take this under advisement. We'll enter a written disposition in due course. Let's take a recess, and we'll start again in a quarter of an hour. All rise.